We have two cases on this afternoon's docket for oral argument. The first is cause number 20-61061, Williams v. City of Yazoo. Is the appellant ready to proceed? You may. Good afternoon, your honors. May it please the court. The district court's order in this case includes both analytical and substantive errors. You have to say your name for the record. Todd Butler for the appellate, your honor. My apologies. The district court's order includes both analytical and substantive errors. Analytically, the order fails to separate the knowledge of each individual defendant. It fails to grapple with qualified immunity. In the state law analysis, it conflates the standard that applies to a municipality with what applies to individual defendants, and at one point in the opinion, it characterizes the officer's conduct as negligent, and then later it recasts the same conduct as reckless disregard and allows the case to go forward. Any of these errors alone require reversal, especially in the immunity context where we're not just liability. As a substantive matter, the undisputed facts simply do not rise to the level of what this court has always called the extremely high standard of deliberate indifference. There has to be actual knowledge of a substantial risk of serious harm, not should-have or constructive knowledge. Both the district court's factual findings and the plaintiff's theory of the case show that actual knowledge is missing. At 1245 and 1246 of the record, the district court found that the officers were unaware that the decedent may bleed internally from the, quote, Calvin Smith inflicted injury, but he said there might be enough that a jury could infer that. With all due respect, that should have ended the analysis. That's a recognition that there is not an appreciation of a substantial risk of serious harm, and there should have been a finding of no deliberate indifference. That's consistent. What time did the mother show up to tell him that her son had a clotting condition? The timing in the record is unclear about what time she was at the jail. All of this happened around the four-and-a-half-hour period. The 911 call came in at, I think, 945 p.m., and I think he was found unresponsive by 215 a.m. Right. So we're talking about a four-and-a-half-hour period. When did the mother come? It's unclear from the record. Well, there must be something in the record documenting that she showed up at the jail and was interviewed. Right. What happened was after he was taken to the jail cell, there was a request for my medicine. And so in response to that, these two officers, or one of the officers, called the mother to inquire about that medical condition, and that's when she didn't talk to him over the phone, but she came to the jail. Now, exactly the time period that that happened, it's unclear from the record. But again, the central point here is— Why doesn't what the mother said and the sister at that point, whenever it was, convey that knowledge that he was at risk of serious medical harm? Right. For that to be a jury question, Your Honor, it would have to rise to the level of obviousness. And the elephant in the room here is the undisputed evidence of intoxication. At 1261 of the record, Judge Wingate specifically found that the decedent was intoxicated. That was confirmed by the toxicology report that showed even hours after he'd stopped drinking, he still had a BAC of .103. And so the principle that can be gleaned from this Court's cases is that when you have symptoms that are demonstrative of intoxication, that they also could be demonstrative of something perhaps more serious. But when his mother says he has a medical condition having to do with bleeding or blood not clotting properly, you connect that to intoxication? Is that what you're saying? That's what I'm saying, Your Honor, because of all the symptoms that he was— I'm talking about the blood—the clotting of blood right now. You're telling me that some police officer would determine that—and maybe that's true. If I drink a lot of alcohol, then I could bleed out faster than if I'm not drunk? Is that what you're saying? I'm saying that everything that they observed was consistent with intoxication. And these are laypeople, non-medical law enforcement. I want you to—I'm talking about what the mother told them about his having a medical condition. How is that connected to intoxication? Because we have to consider all the undisputed facts. And what—these officers were unaware of what symptoms could be associated with internal bleeding or blood clotting. They didn't know that. They're seeing an individual—they're seeing a mother. But you're also telling me—but they concluded that whatever was happening was connected to intoxication. Correct. What would be the basis for them going to that conclusion? That he was falling—that he was falling down. Well, that's a basis to conclude he's intoxicated. Correct. And that was what they did conclude, and that's what they appreciated. All right. My point, Your Honor, is that what the case is—the principle from the case is is that when there is this type of ambiguity in the record, where it could be one thing and it may be something else, then non-medical law enforcement— There's no duty. If you know it could be one of two things, to try and see which one it is. And then when one of them might kill him? Your Honor, the threshold question is the appreciation of the risk. And if the officers do not actually appreciate the risk of harm because it doesn't rise to the level of obviousness, then the first— Where's this obviousness? I know it has to be actual knowledge. Where are you getting obviousness from? One case is Hampton v. Williams, the en banc decision from this court. And what the cases say is that in the absence of direct evidence that they actually appreciated— Why isn't the sister's comment that his clotting condition could be fatal? Why isn't that direct evidence? Because you have to also include the other undisputed evidence of intoxication. And so what they have at the jail is a mother who's angry that the girlfriend was not arrested as well. And they have an individual who they have seen is exhibiting all of these symptoms that are consistent with intoxication. And so that creates enough ambiguity. Are you familiar, there was a case last week in our court, Sims v. Griffin, it was decided. And there the person was, I think it was drugs, not alcohol, but obviously it had a serious episode with drugs. Yet the court also said he's doing all this other stuff, and it found that that risk was known to the officers. I am familiar with that opinion. I actually considered a 28-J on it. But it so far pales in comparison to this case. The individual in that case was in the jail for almost two days. He was throwing up black liquid. He threw up a plastic baggie. All of these things are things that are not associated with normal intoxication. The fact of this case, everything that this individual was exhibiting was consistent with a person who's normally intoxicated. What about the fact that the inmates were trying to get the attention of the jail personnel because he was sick? He needed treatment. He needed medicine. They kept banging on the doors and yelling that he needed medical help. That was all ignored. Right, Your Honor. And that only applies to one of the individual defendants. That's Jailer Langston. But again, you have to consider what it's undisputed that Langston knew. Langston didn't know about being hit with a bed rail. Langston didn't know that he had a medical condition from the mom. All Langston knew is that he was intoxicated. And so the real question there is if a jailer knows if an individual is undisputedly intoxicated with no other symptoms or nonspecific beating on a jail cell requesting help, does that rise to the level of obviousness? That's the specific question. I'm aware of no case from this court that would make that holding. But even if that were the conclusion in this case, there's the added component in this case of qualified immunity. And all except for an obvious case, there's a requirement that a factually specific case be proffered. Who did the mother report to that he had this medical condition? Who did she report that to? The testimony is that she said it amongst five of the officers when she was at the jail. Just not Langston? So five of them heard it, but Langston didn't know it? That's correct. Not one of the five communicated anything to Langston? Right. There's no evidence in the record that suggests that, Your Honor. And you don't think they had any obligation to do anything based on hearing that report from the mother? Your Honor, that may speak to the reasonable response inquiry of deliberate indifference, but it tells us nothing about the first component, which is the actual subjective knowledge of an appreciation of a risk of harm. I do not dispute that it is a fact question about what the officers knew. What information they had one way or the other, that is a fact question that we're not challenging on appeal. The legal question in this case is does the ambiguity rise to the level of obviousness? That's the question. And under this court's cases, under Domino, under the recent decision of Roberts v. Lessard, take that case, for example, Your Honor. The facts are worse than they are here. There was actually a drug screen that ruled out intoxication. And the court said there was enough ambiguity in the record from pre-test statements that he may be drunk, or that he may be intoxicated, that that was enough to create ambiguity on the question of obviousness. Does your brief say the standards of obviousness? You don't even cite that Hampton case. I know there's an obviousness when you get to Part 2 of qualified immunity, but you seem to be saying that there's an obviousness requirement for knowing about the risk. We do cite the Hampton case in our brief, Your Honor. We do cite that case, and I think it goes hand in glove with the appreciation requirement. Not only does there have to be knowledge of the substantial risk of serious harm, they have to actually appreciate the substantial risk of serious harm. And that's the legal question that we challenge in this case. But again, there's also the added component of qualified immunity. The two most recent Supreme Court cases from just this term, I think Revis and Bond— Did they get a report that he had been hit with something? A blow severe enough that it caused him to, at least— No. So at the scene, that's when two of the officers were aware of that, Your Honor. And he said, you know, I've been hit. And they said, okay, well, pull your shirt up. Let me observe you. And so that's when they looked for any kind of manifestations about being hit with the bed rail. And all they saw was scrapes consistent with him fighting with his girlfriend. So that's one of the things they did in response. So those two officers didn't tell the other officers at the jail when they brought him to his cell? There's no evidence in the record that suggests they did, Your Honor. You mean they didn't say they did? Right. And I don't know of any questions that were asked on that point. The record is solid on that, Your Honor. But again, the added layer of qualified immunity in this case, and all except an obvious case, there's an obligation to point to a factually specific precedent. The plaintiffs have proffered three, two of which do not even find a constitutional violation. The only one that does is the Nairn case. And in Nairn, that was an automobile case that dealt with external injuries, no intoxication. And the finding was that the officers didn't help this individual because he ran from them. That's nothing like what we have in this case. That certainly doesn't meet the factual specificity requirement. The district court didn't address that second requirement, but you're saying we should go ahead. I know in your brief you say the case has been going on so long. I think the court has discretion of whether to remand and require that. Some cases do that and say you've got to conduct an individualized assessment of qualified immunity. In some cases say we'll do it on our own. I think this court has discretion to make its own decision on that. I found the Williams v. Hampton. You do cite it once on page 16, but not saying that it has to be obvious. It's just cited for the general standard of awareness. I know there's also some other footnotes, Your Honor, citations that talk about obviousness, but it comes up and that was the issue or one of the issues in Hampton v. Williams about what gets you to a jury question of this appreciation of the risk. The dissenting opinion in the Almont court said you're requiring too much. You're requiring direct evidence of appreciation of the risk, so the only thing that would satisfy that would be a concession by the officers. What the majority said was no. To make a triable question, it has to rise to the level of obviousness. Our point in this case, the most important point I think, is that because there's so much ambiguity, we're talking about a condition of internal bleeding. We're talking about somebody who was undisputedly highly intoxicated. We're only talking about a four-and-a-half-hour period of time. This is consistent with Domino. It's consistent with Robert v. Lessard. It's consistent with the Baldwin case, Your Honor. All of these cases say that when there's this type of ambiguity in the record, the extremely high standard of deliberate indifference isn't met. So I think that's the important point. But then you add on the additional requirement of qualified immunity. This court's always said it's the rare case where qualified immunity will be denied. So even to the extent that it's debatable on whether it's obvious or not, the tiebreaker is QI. We also make arguments under state law, Your Honor. We're unaware of any such thing as a state law denial of medical care claim. I think the procedural argument is especially interesting and strong. So we would ask the court to reverse and render. Thank you. Thank you, counsel. May it please the court. You may proceed. Paul Williams on behalf of the appellees in this case. And as the court is certainly aware, this case involves the tragic death of Marshawn Williams, a 24-year-old African-American male who was arrested following a domestic disturbance at a location where he resided with his girlfriend and mother of his child, Lavina Smith. The fatal drama in this case, as has been pointed out, requires consideration of the totality of the circumstances that occurred from the time that the police were called to the scene at the location where he was arrested all the way through the night hours where Mr. Williams and other inmates were calling, begging for help and medical assistance for his emergent medical needs. In considering the totality of the circumstances in this case, Your Honors, it is important that this is not a symptoms-only case. As counsel has pointed out, there are a number of cases that deal with intoxication and how officers cannot be held to a standard of recognizing the symptoms that they are unaware of that could also be related to intoxication. That is not what we are asserting in this case. This case is a symptoms-plus case. It is a symptoms-plus knowledge, knowledge of Mr. Williams having been struck in the side with a metal object. Some of them were aware it was a bed rail. Others said it was a metal object. That knowledge was not with just two of the officers. It's actually with four of the officers, those officers being Officers Banks, Dean, Thompson, and Harris. And the record before the court clearly demonstrates that each of them, at record 805, 816, 826, 828, and I could go on, but each of these indications are that Mr. Williams had scratches on his arms and a scratch on the side of his ribcage, which he stated came from a pipe. So these scratches that counsel has pointed out to stating that they are related to what looks like scratches from a female, Mr. Williams, at the scene of the arrest, informed these officers by pulling up his shirt, this abrasion, this scratch, this injury was from an assault that happened to me. So there's knowledge of the assault. Beyond that, this all started, the police were called at 943 p.m. on the night of May 18, 2014. It was after Marshawn was taken to the jail when he was placed in booking and he was brought into the cell and he was asked some questions, he fell out of his chair, he urinated on himself, and then the officers, being Dean, Banks, and Jaco, then took Mr. Williams from booking to his cell. It is during this time period in which Jaco, Dean, and Banks were aware of Marshawn Williams asking for help, asking for medication. Following this point in time is when Officer Jaco, who was off duty at the time, but at the request of Lieutenant— When he was asking for medication, was he on some prescription medication? He had prescription medication, but he did not take it with regularity. He had two primary medical conditions that are at issue and relevant and pertinent to the issues in this case, the first of which was cirrhosis of the liver, which he was diagnosed with at an early age. That he did have medication, but did not take it with regularity. The second and more pertinent medical condition that he had was pancytopenia. That is identified in the autopsy report as a condition that he had, but the mother described it when she came to the jail informing the officers. I believe counsel stated five of them. Our position is that the record demonstrate that all seven of the individual officers were present and heard her describing Mr. Williams' underlying medical conditions. Does that include Langston? That included Langston. In the record, it does not demonstrate she did not identify Jailer Langston by name. However, when she got to the jail and she was being deposed, or later when she was being deposed about who was present when she was at the jail, she identified a lady at the desk. We know through discovery in the case that there was no other individual at the jail other than Langston and the six officers who were there. While she did not tell them of pancytopenia's specific diagnosis, he was not taking any medication for this, but what it is is it's a condition that he had where she described he had low platelets, low red blood cells, low white blood cells. That is a clotting condition that he had. And, of course, in informing this condition to the officers, what Ms. Donnie Williams said was that she was aware that some injury had occurred at the house. She did not know he had been struck with a bed rail. She did know that he had experienced some form of injury because she was informed by Calvin Smith that when she was at the location where he was arrested that Mr. Williams had grabbed his side and fallen over on the porch. So knowledge of striking Mr. Williams with an object, knowledge of his underlying medical condition, and his symptoms, the totality of these circumstances present a situation in which these officers were subjectively aware of Mr. Williams' need for emergent medical condition. What did the mother report to the officers? She reported when she got there that she was aware that Mr. Williams had experienced some form of injury. You said she reported about this clotting condition. That's right, the clotting condition. And did she further report what could occur as a result of this clotting condition? What she told them was that he had a clotting condition. If he was injured in any kind of way, he could bleed internally. And then Marshawn's sister, who came to the jail with Ms. Williams, stated, and he could die. He could bleed out and die. That is the information that was provided to the officers in the encounter between Ms. Donnie Williams and Mr. Williams' sister, who was also present at the jail. So in this case, we are not stating that an officer is supposed to interpret signs of internal bleeding independently when there's only evidence of intoxication. And I think the counsel pointed out on their argument that the Roberts v. Lessard case, Domino case, these cases deal with individuals who are highly intoxicated. We even believe that that allegation in this case may be, it's certainly a factual dispute. I'm not certain that it's material to the outcome of the case. But his blood alcohol content was .103. This is not a high level of intoxication. In fact, Officer Banks, who was at the scene when he arrested Mr. Williams, identified only four beer cans that were on the porch.  .08 in the state of Mississippi. And so, contrary to Domino and the Roberts case, which dealt with individuals who did not have, or officers who did not have any more knowledge of what was going on with the inmate, other than intoxication or perceived intoxication, this case is dramatically different. And what we have here is . . . What case shows it's clearly established? Do you agree the district court didn't get to that? They did not get to that. So just assume an arguendo. If we were to agree with the district court on what it did get to, should we send it back for the parts it didn't get to, or should we decide on it? Your Honor, I believe that this court can decide that question, particularly because of the fact that these cases, this clearly established law, was raised during the pendency of the case before the district court. And specifically, as it relates to the clearly established law standard, the appellees identified the City of Canton case, Hare v. City of Corinth, and also most specifically, and probably most analogous to this case, the Nairn v. Livingston Police Department case. And counsel did point to certain differences or perceived differences in the facts of the Nairn case from this case, but what we have is almost identical. It did not deal with an automobile accident, but in the Nairn case, what the court stated was that they had knowledge of requests for medical attention. The officers had knowledge of abrasions, external abrasions, and they had knowledge of the fact that there was an automobile accident. Mr. Williams requested medical attention. But they didn't believe it was intoxicated. They did not believe it was intoxicated. That is correct. That is a difference in this case. But as it relates to the specificity requirement of clearly established law, the inquiry boils down to whether or not defendants had fair notice that they had acted unconstitutionally. And I think that what that case clearly does, and especially since it points to the Hare v. City of Corinth case, as the case in which the Fifth Circuit certainly pointed out that Nairn, the specific right to medical attention for an arrestee was announced in the Hare case. So we believe that the clearly established law standard was certainly fleshed out in the briefing before the district court, and it is within the ability of this court to find that in this case, absent a ruling or indication in the order itself. I will further point to the order in this case as being a 53-page order. And I know that there are certain arguments that have been made by appellants' counsel as it relates to the individuality of the qualified immunity analysis to each of the officers in this case. And while the specific sections within the 53-page opinion are very brief as they relate to why qualified immunity was being denied with regard to these officers, the facts clearly show an analysis of what each officer knew at different aspects or points and times during the pertinent period of time that evening. And so while there may not be a specific section or heading within the district court's order specifically analyzing between each of the headings, there are factual discussions that gave the district court the ability to rule and find that qualified immunity did not apply in the circumstance. Your Honors, this particular case, I want to move to the reasonableness of the response under the qualified immunity individual liability discussion. Particularly as it relates to the reasonableness of the response, I believe the position is that once the officers had the knowledge that Mr. Williams had been struck with the object, Mr. Williams had requested medical attention, Mr. Williams' mother had placed them on notice of his underlying medical condition, there was no response. So while appellants' counsel may make reference to the fact, well, we called Miss Donnie, the factual inference certainly is that they were aware something was going on because Officer Jaco picked up the phone and called Mr. Williams' mother. Is he on medication? What's going on? The problem is all they did was gather information. There was no response to the information that they gathered. Once they had the information as it related to the injury, the need for help, the medication, they simply stopped. So there was no reasonable response to the subjective awareness that they had of the condition that Mr. Williams was in and his need for emergent medical treatment. Do you have any knowledge of evidence as to when this telephone call happened and when she came? As counsel for the appellants noted, there is no indication on the record as to what time the specific call was made or what time Miss Williams arrived at the jail. What we do know as it relates to the chronology is that it was after Mr. Williams had been taken from booking to the jail and requested medication, and then Officer Jaco, who was identified in the record as one of the officers who was assisting Mr. Williams to the cell, called and asked Miss—actually, he called Levina Smith. Miss Donnie was at the location where Mr. Williams was arrested, and Miss Smith handed the phone to Miss Donnie Williams, the mother of Marshawn, who then said, I'm not going to talk about this over the phone. I'm coming right over. So we don't have a specific time, but we know it was in the period of time shortly after transport from booking into the cell. I want to talk separately for a minute about Jailor Langston. Jailor Langston, she has a separate analysis. While it is certainly our position that the record supports that Jailor Langston was in the small room, as defined by Miss Williams, where the discussion was being had about Mr. Williams' underlying medical conditions, Jailor Langston was the jailer in charge of the cells that night. And while she was not aware, and the record demonstrates a lack of awareness of Mr. Williams actually having been struck by any object earlier in the evening, there is indication within the record that Miss Langston heard the inmates beating on the walls and requesting medical attention, medical help for Mr. Williams. There's reference in the counsel for appellant's argument that the only thing that Mr. Williams was complaining or requesting or the inmates were requesting for him was his medication. That's simply not the case. The record demonstrates that inmate Cheatham specifically asked for medical help, stating that he did indicate a need for medicine, but he also asked for, quote-unquote, medical help. Inmate Dew also mentioned that he asked for medical assistance. He said, I need you to call my people, my family, so I can get my medication. Most importantly, inmate Parker, the record demonstrates that Marshawn, as he was being brought down the hallway, indicated to the officers that he needed medical assistance and could not breathe. All of these are, when we get back to the inmates banging on the wall, after the officers had left and only Jailor Langston remained at the jail, they were requesting for medical attention. They were requesting someone to come back there and help. They were requesting for medical treatment because Marshawn could not breathe. They were told, they didn't know whether it was over an intercom or through just yelling down the hall, that Jailor Langston heard the noise, the banging, and told them to be quiet, stop banging on the cells. I can't do anything until the lieutenant gets back. The significance of this is that she heard the request and replied. So her reply infers that she had knowledge of what the inmates were requesting be done. Importantly here is the fact that the inmates stated exactly what Jailor Langston stated in her deposition. She would have had to have told them had they been asking for medical attention. She had the ability to go back to the jail. She stated she did hourly checks. Of course, we dispute that. And then she stated that if somebody needed water in her deposition, she could go back and give them water. But the response that was provided to the inmates requesting medical attention was, I can't do anything until the lieutenant comes back. And she stated in her deposition that that is what her response would have been if someone was asking for medical attention. How else would the inmates have known that that response was the response that would be given in response to requests for medical attention? They wouldn't. She could have gone back there anyway. So Jailor Langston, while she did not have the knowledge that everyone else had as it relates specifically to the underlying medical conditions, she did have the requisite knowledge as it relates to the pleas and the requests for help by the inmates for Marshawn Williams, medical attention, and the fact that he couldn't breathe and the fact that he had needles. So you're conceding that when the mother reported, Langston wasn't present to hear that? I'm not doing that, Your Honor. Our position is that Jailor Langston was present as it relates to the underlying conditions. You said she didn't have the knowledge. Were you talking about Langston just now when you said somebody didn't have the knowledge? The element of knowledge that Jailor Langston did not have was Marshawn having been struck by a pipe. All right. Okay. As it relates, the record demonstrates that as it relates to the knowledge of the communication from Ms. Donnie Williams that that was present because our position is that she was the lady at the desk. I just wanted to be clear. Your Honors, this case is a case that clearly indicates actual subjective knowledge on the part of the individual officers concerning an emergent need for medical attention for Marshawn Williams, and it's not just based upon his symptoms. It is based upon his symptoms and the knowledge of an injury, the knowledge of a medical condition, the knowledge of requests for medical attention. This case easily surmounts the qualified immunity burden, as stringent as it may be, in light of the information known to the officers at the time of the incident in this case. With that being said, Your Honors, I believe I would respectfully request that this Court affirm the decision of the District Court in denying qualified immunity, denying municipal liability, and state law claims. Thank you, Counsel. Rebuttal. Thanks, Your Honor. Just a few quick points. The counsel opposite took issue with whether or not the decedent was intoxicated. There was a specific finding on 1261 of the record where Judge Wingate found it was undisputed that he was intoxicated. My friend on the other side talks a lot about knowledge plus. That's not how the cases talk about deliberate indifference. The question for deliberate indifference is, is there enough ambiguity under the totality of the circumstances to rise to the level of obvious or not? That's the test, and that's our primary argument on the constitutional analysis. Judge Costa.  There's not someone telling the defendants you've got a guy who might die because of his condition. It is more they have to guess what the medical situation is and piece things together. Right, Your Honor. That's fair. But the question, again, is when you consider all of the undisputed facts, is it ambiguous or not? We think cases like Domino, cases like Robert v. Lessard, those cases say when there's— Did any of those cases have someone telling the defendants that he could die? Yes. In Domino, for example, the guy said, I'm going to commit suicide. The inmate himself. Yes. And the nurse in that case said, I've dealt with you before. I think you're faking. And so they said that was enough for it to be ambiguity. So that's the test, Your Honor. And I think we addressed that on page 19 of the blue brief. I'll talk about obviousness on footnote 21 and then again on page 21 of the blue brief. You have to remember, too, the mom's testimony was that all of the symptoms that he was exhibiting were consistent with intoxication. His own cellmate testified, I thought he was drunk. So the question is, what would a layperson, non-medically trained law enforcement officer think and appreciate under these facts? And it just doesn't rise to the level of obviousness. Again, there's just not a case. Judge Graves, you asked me about what do you make of the mother telling him he's got a medical condition. There is no case that says just because there's a request for medical care, then you automatically have to do something. You have to consider all the facts. If that were the rule— Well, it's different from a request. I'm not talking about a request for medical care. I'm talking about a report about his condition and that it could be fatal. That's what she reported. Between her and the sister, that's the information that was shared with the officer. Right, but if you have no reason to think about what you're observing— Either you didn't believe them or you're telling me you're free to conclude that every single thing that's happening with him is related to alcohol, his consumption of alcohol, and has nothing to do with the condition, which they reported he has. If you believe he has it, then I guess you're free to decide, but everything that's happening to him is related to alcohol.  One, the source of the information matters. We know that from Domino. And so you've got a mother who is mad, is at the jail cell mad that her son was arrested and the girlfriend wasn't arrested. So she lies because she's angry. No, you get to consider the source. If she wants the son not to be in a jail cell, then, yeah, you do have to consider that. That would be no different than if you arrested a suspect and he said, you know, I've got a cut finger. I want to go to the doctor. I don't want to go to jail. The officer doesn't automatically, just because somebody says I need to go to jail, if they don't believe him because of all the surrounding undisputed facts, that kind of request is not one where they would automatically appreciate an immediate risk of harm. So he was lying, his mother was lying, and his sister was lying. You're free to conclude that all those sources are unreliable with regard to his condition. It's a factor that speaks to ambiguity, Your Honor, when you consider all the undisputed facts. It is, and that's what this court's cases conclude. I also would mention again QI to the extent that this is even a close case on the underlying constitutional question. QI is the tiebreaker. Do you know what the name of his condition is, what it's called? Cirrhosis is what the autopsy speaks in terms of, and that's what required him to bleed. Some kind of hepatic or hep? Right. I think the cause of death, they said cirrhosis, Your Honor. I'm just thinking if I was going to make up something, I'd probably find something I could pronounce. Right, right. I think the autopsy speaks to that, Your Honor. Again, very unfortunate case, even to the extent that the court were to think it's negligence or even gross negligence. This court has said akin to criminally illegal conduct is what deliberate indifference requires. Thank you, Your Honors. Thank you, Counsel. The court will take this matter under advisement.